A jury found defendant-appellant guilty under an indictment charging that he did "knowingly enter or remain unlawfully in a building of Cleve Smith, with intent to commit a crime therein, to-wit: theft, in violation of Section 13A-7-7 of the Alabama Criminal Code," which denominates such crime as burglary in the third degree and classifies it as a Class C felony. After a duly conducted sentence hearing, the court sentenced defendant to imprisonment for eight years, a sentence within the limits prescribed for a Class C felony by § 13A-5-6 (a)(3) of "not more than 10 years or less than 1 year and 1 day."
According to the testimony of Mr. Cleve Smith, a garage owned by him at 1200 Vanderbilt Road North in Birmingham was broken into on the evening of February 7, 1982, and some valuable power tools and other tools were taken therefrom by someone without the owner's consent. A "fellow by the name of Raymond Harris" called him "somewhere near 10:00 by telephone and informed" him as to the incident. He left promptly to go to the garage and "found the glass had been broken out the door" and several of the tools were missing from the tool box. He further testified: *Page 390 
 "A. I called the police before I left home for them to meet me there.
 "Q. This was after you had this conversation with Mr. Harris?
 "A. Yes, ma'am. When I hung up from talking to him I called the police, and got them to meet me at my shop. But I beat them there. So I left my wife at the shop so she could tell the policemen where I had went. I went to the Handy Pack, which was about three blocks from my shop. I think it's a Jr. Foods Store or something like that back up on 31st and 12th Avenue, because I learned that's the way they had went with my tools so I was trying to catch them."
"Q. Did you catch them?
"A. I caught one.
"Q. And did you get any of your tools back?
"A. No, ma'am.
 "Q. The person that you caught, is that person in the courtroom today?
"A. No, ma'am.
"Q. Now, after you caught this one, what did you do?
 "A. Well, after I caught him, he was at the store, he was a juvenile, so I held him there until the police came on up. My wife told them where I was. They came on up to the store. And then the policeman got him."
Mr. Raymond Harris, a witness for the State, testified he lived across the street from the garage, that he had just come home from National Guard drill on the evening of February 7, 1982, when he observed, inter alia, the following:
 "Q. You say you observed black males outside this garage?
"A. Right.
 "Q. Would you tell the jury what you observed them doing?
 "A. Well, I seen two guys over to the shop, one was standing in front of my door and the other two was over there getting some tools out of this garage.
"Q. What did you do then?
 "A. Well, I went over there and I pulled my car halfway in the middle of the street and got out. And I said, hey, what y'all doing. And they was breaking in the man's shop. I said, hey, put the man's tools back or I'll call him and tell him somebody has broke off in his shop. By that time they started giving me, you know, they was giving me some words and said they wasn't going to do nothing.
"Q. Well, what did they say to you, Mr. Harris?
"A. Well, they was using profane language.
 "Q. Now, you say, `they.' Was all three of them, one of them —
"A. No, it was two.
 "Q. Two of them. Okay. Could you describe those two people that were giving you this profane language?
"A. He was one of them (indicating).
"Q. Do you know this person over here?
"A. All I know is his name's Sleepy.
 "Q. Sleepy? Have you ever seen him before the evening of February 7th, 1982?
"A. I have seen him a couple of times.
 "Q. Would you describe how he's dressed today in the courtroom?
 "A. He have on bluejeans, beige sweater, black and gray shirt.
 "Q. And is this one of the men that was carrying the tools out of the Cleve Smith's shop?
"A. Yes, it was.
 "MS. BARCLAY [Assistant District Attorney]: Would the record please indicate that the witness indicated the defendant, Larry Bernard Jones.
 "Q. And you had a conversation with Larry Bernard Jones, didn't you?
"A. Yes, I did.
 "Q. And was he one of the ones that gave you back the profane language?
"A. Yes, he was.
 "Q. And was he one of the ones that you tried to get to put the tools back in Cleve Smith's shop?
"A. Yes.
". . . . *Page 391 
"Q. How many tools did you actually see Sleepy with?
"A. A handful.
 "Q. Handful. Now, after you left Smith's Garage and after you had this conversation with the defendant and tried to get him to put the property back, what did you do?
 "A. Well, I went home and went in the house and I called Smith. And he came over to his garage. And I had told him, I said, well, a couple of guys broke in the shop. And I said I know the little boy, we can go up there and get him, he could tell you where your tools at.
"Q. And what did y'all do after that?
 "A. Okay. By that time the police came up, and me and Smith got in his car and we followed the police up to the Handy Pack, what they call the U-Tote-M Store. And this is where the little guy was. And the police asked him and he went to telling the police he knew Sleepy and the other guy. And he told them their names."
The defendant took the stand in the case and testified definitely that he was not one of the three persons at Smith's garage apparently participating in a burglary, that he was at his cousin's residence at the time and that he had no knowledge of or connection with the alleged burglary. He said he was known by the nicknames of Sleepy, California Slim, and Sleepy Hollow but that there were "two more dudes over in Norwood they call Sleepy, too." He gave his age as 21 years. He manifested a splendid acquaintance with the neighborhood and seemingly was more accurate as to locating the home of Raymond Harris relative to the location of the garage than was Mr. Harris, in that he finally made it clear that Mr. Harris's house, though across the street from the garage, was not directly so, but that there were two other houses more nearly directly across the street from the garage than was the home of Mr. Harris. Defendant's cousin corroborated defendant's testimony as to an alibi.
Appellant's attorney makes an impressive argument in support of one of the three contentions for reversal, to the effect that the trial court was in error in denying defendant's motion for an acquittal on the ground that there was no substantial evidence that defendant was guilty of the alleged burglary. However, notwithstanding the lack of absolute certainty by the evidence that defendant was guilty, we are convinced that a jury question as to his guilt was presented and that the trial court was not in error in denying defendant's motion for an acquittal.
Another issue presented by appellant is as to whether the trial court erred in overruling a motion of defendant "to sequester the jury." The motion was made soon after the jury was selected and sworn on December 6, 1982. By Act No. 82-566, effective upon its approval by the Governor on May 4, 1982, the Alabama Legislature wrought a change in the pre-existing law as to the sequestration of a jury in a criminal case in the following paragraph of said Act:
 "(d) In the prosecution of any non-capital felony the trial court in its discretion may permit the jury trying the case to separate during the pendency of the trial, provided that the court may at any time, on its initiative or on motion of any party, require that the jury be sequestered under the charge of a proper officer when they leave the jury box or the court may allow them to separate. . . ."
The trial court was not in error in denying defendant's motion that the jury be sequestered.
Appellant's only other contention for a reversal pertains to the action of the trial court in admitting in evidence eight photographs exhibited by police officers to the witness Raymond Harris, which included one photograph identified by Mr. Harris as the defendant and another identified by him as the other man at the garage on the evening of February 7, 1982, just before the witness phoned Mr. Smith. Appellant takes the position that the photographs were "mug shot" or "rogue's gallery" photographs that did not meet the "three-prong *Page 392 
test" of Holsclaw v. State, Ala.Cr.App., 364 So.2d 378, cert. denied, 364 So.2d 382 (1978). In anticipation of the question as to the admissibility of the photographs, the jury was excused from the courtroom and a lengthy voir dire interrogation was conducted by attorneys for the respective parties of Sergeant Gerald R. Hill of the Birmingham Police Department, who was the next witness called by the State after Raymond Harris. Before the jury was allowed to return to the courtroom, Raymond Harris was recalled as a witness, for the purpose of voir dire interrogation out of the presence of the jury as to the question of the admissibility of the photographs. During the interrogation by defendant's counsel, Mr. Harris said as to the photographs:
 "Q. All right. And when he gave them to you did he give you any instructions?
 "A. No. He just asked me to look through the pictures and see which guy that I think that broke off in Smith's Garage.
"Q. All right. Did he tell you to look at the back?
"A. No, he didn't. I didn't look at the back.
 "Q. What did he tell you, just look at the front and see if you could identify the parties?
"A. Right.
 "Q. All right. And if he gave you these pictures like this and went through these pictures, do you recall which ones you identified?
 "A. Yes, I would. I went through the pictures and looked. That's one right there (indicating).
"Q. Is that Exhibit 7?
"A. And this one right here (indicating).
 "Q. At the time did you notice if there was any writing on the back?
"THE COURT: He said this and that?
 "MR. CHRIST [Defendant's Attorney]: Exhibit 7 and 8 he picked out, Judge.
"Q. At that time was there any writing on the back?
"A. I didn't look at the back.
"Q. You didn't look at the back?
"A. No I didn't.
 "Q. All right. Did you know the name, Larry Bernard Jones, or did you know this investigation [sic] as Sleepy?
"A. I just know his name as Sleepy.
"Q. Okay."
At the conclusion of the voir dire interrogation of the witness Harris, the following occurred:
 "MS. BARCLAY: Offer this for the purpose of the motion, State's Exhibit 8.
 "THE COURT: All right. Mark them in. Both of them are in for purposes of identification for purposes of the voir dire.
 "(State's Exhibits 7 and 8, Voir Dire, were received in evidence.)
"Q. And State's Exhibit 7 who is that picture?
 "A. That's the guy called Slim, I never knowed his name.
"Q. Okay. Was he there?
"A. Yes, ma'am, he was.
"Q. And was he involved in the burglary?
"A. Yes.
 "MS. BARCLAY: Offer this, too, for purposes of the motion.
 "THE COURT: It's in already. Anything further from anybody?
"MR. CHRIST: No, sir, Your Honor.
 "THE COURT: Okay. I think the identification is in issue. And I think this is admissible, and I'll overrule the motion to suppress. And we will now take a ten-minute recess.
 "MR. CHRIST: Well, for the purpose of the record I will make an exception.
 "THE COURT: Sure. I understand. Put this on the record, too: I'm going to cover up the identification, put little whites of paper over that Birmingham Police Department identification number.
"(Recess).
"(Jury present)."
At the time State's Exhibits 1 through 8 were introduced and received in evidence, which was during the testimony of Raymond Harris upon his being recalled *Page 393 
as a witness for the State, defendant's attorney again interposed an objection, as shown by the following portion of the transcript:
"MS. BARCLAY: We offer State's Exhibit 8, Your Honor.
 "THE COURT: All right. Are you going to offer them all?
"MS. BARCLAY: Yes, sir, I am.
"THE COURT: All right. Mark them all in.
 "MR. CHRIST: Your Honor, for the record, I'm going to object.
"THE COURT: Right, all right. I'll overrule it.
 "(State's Exhibits 1 through 8 were received in evidence.)"
In our opinion, the action of the court in overruling defendant's objections to State's Exhibits 1 through 8 was not in conflict with anything said or held in Holsclaw v. State,supra, or any of the authorities cited therein. There is no disagreement between the parties as to the correctness and soundness of the three-prong test set forth in Holsclaw, which appellant paraphrases as follows:
 "(1.) The state must have a demonstrable need to introduce the photographs (no need if the accused can or has otherwise been identified); and
 "(2.) The photographs themselves, if shown to the jury, must not imply that the Defendant has a prior criminal record; and
 "(3.) The manner of introduction at trial must be such that it does not draw particular attention to the source or implications of the photographs."
Our conclusions as to appellant's analysis of the "three-prong test" are as follows:
 1. There was a demonstrable need for the State to introduce the photographs. We do not agree with appellant's parenthesized argument that there is "no need if the accused can or has otherwise been identified." There would be no such need, in our opinion, in a case in which the accused has been conclusively and undisputably identified as a party guilty of the alleged crime. In the instant case, however, both before and after the defendant and his cousin took the stand to testify that he was not one of the persons participating in the burglary, the identity of defendant was a live and intensely controverted issue, as indicated by the trial court's statement, "I think the identification is in issue." It appears to us that it was the only contested issue of fact in the case.
 2. Although the testimony during the voir dire interrogations out of the presence of the jury disclosed that the photographs were photographs taken while the persons photographed were in the City Jail, they did not necessarily imply that the defendant had a prior criminal record. There was no contention that he had a prior criminal record. Furthermore, there is nothing in the transcript to indicate that the jury was informed in any way that the photographs were taken of persons while such persons were in the City Jail.
 3. The manner of introduction at the trial did not, in our opinion, "draw particular attention to the source or implications of the photographs." The trial judge did as much as a trial judge could have reasonably and prudently done to prevent any "particular attention to the source or implications of the photographs" by assiduously placing white paper over markings or numbers on the photographs so as to leave nothing thereon of any significance other than the photography of the persons photographed.
The foregoing leads us to the conclusion that no contention of appellant for a reversal is well taken and that the transcript discloses no obvious error prejudicial to defendant.
The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his *Page 394 
opinion is hereby adopted as that of the Court.
AFFIRMED.
All the Judges concur.